ams

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

TANI WICKSTRUM,                )
                               )
            Plaintiff,         )
                               )
                               )
vs.                            )    Case No. 09-2444-JAR
                               )
DR. JACOB AMRANI,              )
                               )
                               )
            Defendant.         )
_____)

## MEMORANDUM AND ORDER

This diversity case is brought by plaintiff Tani Wickstrum, alleging that her physician, defendant Dr. Jacob Amrani, deviated from the standard of care in obtaining informed consent to perform her back surgery. This matter is before the Court on defendant's Motion for Summary Judgment (Doc. 32). The motion for summary judgment includes a motion to exclude the testimony of plaintiff's designated expert, Dr. Steven Graboff. The motion is now fully briefed and the Court is prepared to rule. As explained more fully below, defendant's motion to exclude and motion for summary judgment is denied.

**I.    Uncontroverted Facts**

The following facts are either uncontroverted or viewed in the light most favorable to plaintiff.[1] Dr. Amrani performed a posterior stabilization and fusion surgery on plaintiff's spine on November 7, 2005. Plaintiff suffered a nonunion of her spinal fusion approximately ten

---

[1]Plaintiff admits each of the facts set forth in the motion for summary judgment and does not submit any additional statements of uncontroverted fact.

months after her surgery. A nonunion is a recognized complication of a spinal fusion surgery. Plaintiff alleges that the November 7, 2005 surgery resulted in a severe worsening of her condition. She further alleges that "Defendant was negligent in failing to inform me of all risks associated with the medical procedure and in making false representations and in failing to inform me of the likelihood of success and expected results."[2]

Plaintiff was deposed on May 7, 2008. Plaintiff testified that she was seen by Dr. Douglas Burton in January of 2005 for an evaluation for potential back surgery. Plaintiff testified that Dr. Burton would not perform surgery on her because of her age and because she smoked. In Dr. Burton's Medical Chart, he dictated, in part, the following after his evaluation of plaintiff: "I have recommended warm water walking to her. I would not recommend an operation to her right now. I would like to see her back in 6 months after a steady course of exercise."[3] Plaintiff testified that she quit smoking about a month before Dr. Amrani's surgery and restarted smoking about three months after her surgery. When asked why she did not tell Dr. Amrani about her prior evaluation by Dr. Burton, plaintiff testified: "Well probably, if – I might have not told them if I thought that he would tell me no."

When asked what Dr. Amrani told her during her first visit with him, plaintiff testified as follows:

> I just – I told him that I wanted to get my back fixed and he told me that he could fix me. He said – he said "We'll fix you right up." And I kind of looked at him with a little in surprise on my face, he said "You didn't think it would be that easy, did you?" And I said "No, I didn't." And then it was – he said that I – he wanted to – this was like on a Thursday, and he asked me when did

---

[2](Doc. 33, Ex. F, No. 5.)

[3](Doc. 33, Ex. H.)

I want to have the surgery done, and I said "Well, soon," and he
said well, he said "We could schedule it for Monday," and I was
like "Well, that's a little bit too soon," because I needed to give
some notice at work that I was going to be gone. And then he said
"I'll have you visit with the lady that schedules the surgeries." And
then he was gone.[4]

Plaintiff subsequently testified in her deposition regarding an appointment with Dr. Amrani on October 4, 2007 and about the questions she asked about her upcoming surgery:

> Q. Did you ask any questions about the surgery?
> A. I asked him about how long did it take, and he said that it would
> take about eight and a half hours. That's probably about all I asked
> him.
> . . . .
> Q. And is that the only conversations you ever had with him about
> the surgery?
> A. Yes.
> Q. If we assume that that – that your memory is accurate about
> those were the discussions, it's not very much discussion, is it?
> A. No, it isn't.
> Q. And you were comfortable and wanted to go forward with the
> surgery in spite of that?
> A. Yes.
> Q. And you didn't have any other questions about an eight and a
> half hour surgery on your back for your scoliosis other than how
> long it would take?
> A. Oh, well, I asked him how long would I be – would it be before
> I can go back to work, how long was the recuperation time.
> Q. Okay. And how long did he say it would be before you could go
> back to work?
> A. He said I should be able to go back to work within three
> months.
> Q. Okay. And how long did he tell you the recuperation time was?
> A. He said the total healing time for it was six months and could be
> up to a year.
> Q. So, six to 12 months?
> A. Yes.
> Q. And those are the only things you can recall asking him,
> correct? You'd had surgeries before this, correct?

---

[4](Doc. 33, Ex. G at 95.)

A. Correct.

Plaintiff testified further about how Dr. Amrani explained the purpose of the surgery:

> Q. Did he discuss with you the fact that – did you understand that the screws and rods would be used to try to straighten your spine?
> A. Yes.
> Q. Did you think it was going to be straight as an arrow when it was done, up and down?
> A. He told me that he could correct my curvature and get approximately 50 percent and reduce the size of the hump.
> Q. That he could correct it by about half, 50 percent?
> A. Yes. Yes.
> Q. And that that would help reduce the hump?
> A. Yes.
> Q. So, you still knew that even under the best circumstances, it was his hope to get 50 percent correction?
> A. Yes.
> Q. Meaning that you'd still have curvature of about half of what it was?
> A. Yes.
> Q. Did you have any discussion with him about the fact that if you did not have surgery that there's a chance or a probability that you – it would continue to worsen like it had the year, year and a half before that?
> A. I don't remember.
> Q. Did you believe in your own mind that as it was getting worse, that if you did not have surgery that it was probably going to keep getting worse?
> A. Yes.
> Q. And had anybody told you that, "Oh, when you get to be 45, it's just going to stop," or 50 years old or anything like that?
> A. No.
> Q. Did Dr. Amrani explain to you that in addition to the screws and rods that they would be putting bone from your hip into the joints of the spine to try to get it to fuse?
> A. Yes.[5]

Plaintiff's expert disclosure deadline in the initial state court proceeding was May 30,

---

[5] *Id.* at 107–09.

2008. Within the state court proceeding, plaintiff disclosed her experts on May 30, 2008. Plaintiff did not produce a report from Dr. Graboff. Instead, within plaintiff's disclosure, plaintiff's counsel provided a summary of Dr. Graboff's expected testimony in accordance with K.S.A. § 60-226. This summary provided:

> Dr. Graboff is expected to testify that the standard of care required of an orthopaedic surgeon demands that the surgeon fully advise his patient of all the risks presented by the surgery planned or contemplated, including the likelihood of success and the likelihood of a failed surgery, and the possible results of an unsuccessful surgery, as well as advice about the risks certain lifestyle choices present to the likelihood of success of the surgery. He is expected to testify that this is the standard of care required in the case of all surgeries, including a planned spinal fusion of a scoliosis patient like plaintiff. He is further expected to testify that, according to the events as reported by plaintiff regarding her interactions with Dr. Amrani and his staff, the standard of care was not met by Dr. Amrani in his dealings with plaintiff prior to her spinal fusion because, according to plaintiff, neither Dr. Amrani nor his staff discussed any possibility that the fusion would have any result other than success, and he and his staff did not discuss with plaintiff that she could end up in her present physical state as a result of the surgery.[6]

Dr. Graboff was deposed in Los Angeles, California, on July 21, 2008. Dr. Graboff testified that he was retained on May 30, 2008, which is the same day plaintiff filed her disclosure of expert witnesses. Plaintiff's counsel sent some medical records to Dr. Graboff on May 30, 2008, along with a retainer check. Dr. Graboff did not review the records sent by plaintiff's counsel until June 12, 2008, approximately two weeks after he was disclosed as an expert witness pursuant to plaintiff's expert disclosure deadline. Dr. Graboff was not provided with plaintiff's deposition transcript until July 16, 2008, more than six weeks after he was

---

[6](Doc. 33, Ex. J.)

identified as an expert in the state court case.

At the time of his deposition, Dr. Graboff had not reviewed the deposition testimony of Dr. Amrani, nor had he reviewed or approved the expert disclosure prepared by plaintiff. Dr. Graboff was not aware at the time of his deposition that plaintiff had been evaluated for surgery by another orthopedic surgeon or neurosurgeon prior to her treatment by Dr. Amrani. Dr. Graboff was not aware of any other discussions plaintiff had with other physicians regarding the risks and benefits of a scoliosis fusion and instrumentation surgery prior to her November 7, 2007 surgery.

The state court case was dismissed without prejudice on January 30, 2009. As part of the journal entry of dismissal, the parties agreed that, if the matter was re-filed,

> all discovery previously completed shall apply and have full effect in any subsequent action . . . . If this matter is refiled by plaintiff, the case shall be placed in the same procedural status as it was at the time of the dismissal, to prevent any prejudice to defendant. Therefore, if refiled, the previous discovery deadlines that had expired will be enforced and no new claims or theories of liability will be allowed.[7]

Plaintiff re-filed her case against Dr. Amrani in this Court on August 24, 2009. Plaintiff asserted claims for negligence and violations of the Kansas Consumer Protection Act ("KCPA"). As the parties previously agreed, plaintiff has disclosed no new experts or opinions in the current case. Subsequent to defendant filing the instant motion for summary judgment, plaintiff voluntarily dismissed her claims under the KCPA.

## II. Motion to Exclude Expert Testimony

Because much of defendant's motion for summary judgment turns on the admissibility of

---

[7](Doc. 33, Ex. O.)

expert testimony, the Court will first address the motion to exclude Dr. Graboff's testimony.

## A. Standard

The Court has broad discretion in deciding whether to admit expert testimony.[8] Fed. R. Evid. 702 provides that a witness who is qualified by knowledge, skill, experience, training or education may testify in the form of opinion or otherwise as to scientific, technical or other specialized knowledge if such testimony will assist the trier of fact to understand the evidence or to determine a fact in issue, "if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."[9]

The proponent of expert testimony must show "a grounding in the methods and procedures of science which must be based on actual knowledge and not subjective belief or unaccepted speculation."[10] In order to determine whether an expert opinion is admissible, the court performs a two-step analysis. "[A] district court must [first] determine if the expert's proffered testimony . . . has 'a reliable basis in the knowledge and experience of his discipline.'"[11] Second, the district court must further inquire into whether the proposed testimony is sufficiently "relevant to the task at hand."[12] An expert opinion "must be based on facts which enable [him] to express a reasonably accurate conclusion as opposed to conjecture or

---

[8]*Kieffer v. Weston Land, Inc.*, 90 F.3d 1496, 1499 (10th Cir. 1996) (citation omitted).

[9]Fed. R. Evid. 702.

[10]*Mitchell v. Gencorp Inc.*, 165 F.3d 778, 780 (10th Cir. 1999).

[11]*Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 884 (10th Cir. 2005) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 (1993)).

[12]*Id*. (quoting *Daubert*, 509 U.S. at 597).

7

speculation . . . absolute certainty is not required."[13] And it is not necessary to prove that the expert is "indisputably correct," but only that the "method employed by the expert in reaching the conclusion is scientifically sound and that the opinion is based on facts which satisfy Rule 702's reliability requirements."[14]

"To qualify as an expert, the witness must possess such 'knowledge, skill, experience, training or education' in the particular field as to make it appear that his or her opinion would rest on a substantial foundation and would tend to aid the trier of fact in its search for the truth."[15] *Daubert* sets forth a non-exhaustive list of four factors that the trial court may consider when conducting its inquiry under Rule 702: (1) whether the theory used can be and has been tested; (2) whether it has been subjected to peer review and publication; (3) the known or potential rate of error; and (4) general acceptance in the scientific community.[16] In *Kumho Tire*, however, the Supreme Court emphasized that these four factors are not a "definitive checklist or test" and that a court's gatekeeping inquiry into reliability must be "tied to the facts of a particular case."[17] In some cases, "the relevant reliability concerns may focus upon personal knowledge or experience," rather than the *Daubert* factors and scientific foundation.[18]

It is within the discretion of the trial court to determine how to perform its gatekeeping

---

[13] *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1222 (10th Cir. 2003).

[14] *Id.*

[15] *Farmland Mut. Ins. Co. v. AGCO Corp.*, 531 F. Supp. 2d 1301, 1304 (D. Kan. 2008) (citing *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 928 (10th Cir. 2004)).

[16] *Daubert*, 509 U.S. at 593–94.

[17] *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999) (internal quotations omitted).

[18] *Id* (quoted in *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1235 (10th Cir. 2004)).

function under *Daubert*.[19] The most common method for fulfilling this function is a *Daubert* hearing, although such a process is not specifically mandated.[20] In this case, the parties have not requested a hearing on this motion. The Court has carefully reviewed the exhibits filed with the motion and believes this review is sufficient to render a decision without conducting an oral hearing.

  *B. Discussion*

Defendant does not challenge either the qualifications or the relevancy of Dr. Graboff's proposed testimony. Dr. Graboff is an orthopedic surgeon based in Huntington Beach, California who has been in practice since 1985. He has performed several scoliosis surgeries during his career and testifies routinely as a medical expert in both medical malpractice and non-malpractice cases. The Court has reviewed Dr. Graboff's deposition testimony and finds him to be qualified to testify as an expert about the matters set forth in his disclosure. Moreover, the Court finds that Dr. Graboff's purported testimony is relevant. To prove her negligence claim, plaintiff must show that Dr. Amrani provided her with insufficient information that would allow her to make an informed decision about her medical treatment.[21] Expert testimony is generally necessary to show that disclosures given to a patient were insufficient in light of the disclosures that would be made by a reasonable medical practitioner under similar circumstances.[22] Because Dr. Graboff's proposed testimony will address this issue, it is highly relevant.

---

[19]*Goebel v. Denver & Rio Grande W. R.R.*, 215 F.3d 1083, 1087 (10th Cir. 2000).

[20]*Id.*

[21]*See, e.g.*, *Funke v. Fieldman*, 512 P.2d 539, 531–32 (Kan. 1973).

[22]*Charley v. Cameron*, 528 P.2d 1205, 1210 (Kan. 1974).

Defendant advances a novel argument in seeking to exclude Dr. Graboff's testimony: that in making its reliability determination, the Court should only consider the evidence before Dr. Graboff at the time plaintiff filed her expert disclosure in the state court on May 30, 2008. Because Dr. Graboff was initially disclosed in the state court case, the disclosure complies with the requirements of K.S.A. § 60-226(b)(6), rather than Fed. R. Civ. P. 26(a)(2). K.S.A. § 60-226(b)(6) does not require a designated expert to prepare a signed report; therefore, no such report was ever prepared. The parties stipulated at the time of the state court dismissal that "new expert witnesses will only be introduced at the discretion of the discovery judge," and that "[w]itnesses already deposed shall not be deposed again, unless by agreement of the parties, . . . ." Defendant reasons that

> the disclosure, as prepared on May 30, 2008, must be considered a full and final disclosure of Dr. Graboff's opinions. . . . As such, in evaluating the reliability and admissibility of Dr. Graboff's opinions under Rule 702, we must evaluate the opinions as disclosed on May 30, 2008 as well as the foundation for said opinions at the time of the disclosure.[23]

Defendant cites no authority for this proposition.

The authority is clear that in performing its gatekeeping function, the Court is to examine the expert's <u>proffered testimony</u> and determine if the expert is qualified, and if the proposed testimony is sufficiently relevant and reliable. If the Court performed this gatekeeping function by the most common method—an in-court hearing—Dr. Graboff would testify about his opinions and counsel would be able to examine him and submit evidence about these issues, which would enable the Court to determine whether Dr. Graboff's proffered testimony is

---

[23](Doc. 33 at 16.)

admissibile.  The Court's gatekeeping function is no different when the issue is submitted on the briefs.  The Court must examine Dr. Graboff's proffered testimony and determine if it is admissible under Rule 702 and *Daubert*.  There is no requirement that this Court confine its analysis to Dr. Graboff's knowledge base on May 30, 2008.  Dr. Graboff was deposed subsequent to this date, on July 21, 2008, and both parties have submitted excerpts from this deposition.  Because the parties do not request a *Daubert* hearing, the Court evaluates Dr. Graboff's deposition testimony to determine if his opinions are sufficiently reliable to be admissible under Rule 702 and *Daubert.*  To the extent there is a discrepancy between the foundation for his opinion on May 30, 2008 and the foundation for his opinion at the time of deposition or trial, it would go to the weight and not the admissibility of Dr. Graboff's opinion.

Dr. Graboff's July 21, 2008 deposition testimony demonstrates he holds a sufficiently reliable foundation for his proffered opinion testimony.  "An expert opinion must be based on facts that enable the expert 'to express a reasonably accurate conclusion as opposed to conjecture or speculation [but] absolute certainty is not required.'"[24]  It is undisputed that Dr. Graboff was provided plaintiff's medical records and her deposition transcript in advance of his own deposition.  Defendant submits that Dr. Graboff could not form a reliable opinion without reviewing Dr. Amrani's deposition testimony.  But Dr. Graboff explicitly disclaimed the need to review Dr. Amrani's testimony and instead emphasized that he based his opinions on the medical records and plaintiff's testimony.  He insisted that the medical records speak for themselves and that his opinion was based on the information found in the medical record, rather than on Dr. Amrani's testimony.  To the extent that defendant disagrees with Dr. Graboff's position that it

---

[24]*Kieffer v. Weston Land, Inc.*,  90 F.3d 1496, 1499 (10th Cir. 1996); *see also First Sav. Bank v. U.S. Bancorp.*, 117 F. Supp. 2d 1078, 1083 (D. Kan. 2000).

was unnecessary to review Dr. Amrani's testimony, this matter is properly addressed on cross-examination because it goes to the weight and not the admissibility of the evidence.

Defendant also complains that Dr. Graboff was not provided with any information about plaintiff's previous treatment by Dr. Burton, who declined to perform the same surgery. Defendant argues that this evidence was clearly important to evaluate issues of informed consent, but fails to explain how. Dr. Graboff is expected to testify that Dr. Amrani did not meet the standard of care when he obtained plaintiff's informed consent to perform the November 7, 2007 surgery. Dr. Graboff testified that Dr. Amrani did not fully advise plaintiff about the risks of the surgery. To the extent this opinion may not be credible because of plaintiff's prior treatment, it again goes to the weight and not the admissibility of his testimony. The Court finds that the medical records and deposition testimony that Dr. Graboff reviewed prior to his deposition was sufficient and allowed him to express a reasonably accurate conclusion. His proffered testimony is reliable and helpful to the trier of fact; therefore, defendant's motion to exclude is denied.

### III. Motion for Summary Judgment

#### A. *Standard*

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law."[25] In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.[26] "There is no genuine issue of material fact

---

[25] Fed. R. Civ. P. 56(a).

[26] *City of Harriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010).

unless the evidence, construed in the light most favorable to the nonmoving party, is such that a reasonable jury could return a verdict for the nonmoving party."[27] A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[28] An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."[29]

The moving party initially must show the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.[30] In attempting to meet this standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim.[31]

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."[32] The nonmoving party may not simply rest upon its pleadings to satisfy its burden.[33] Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a

---

[27]*Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

[28]*Wright ex rel. Trust Co. of Kan. v. Abbott Labs., Inc.,* 259 F.3d 1226, 1231-32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.,* 144 F.3d 664, 670 (10th Cir. 1998)).

[29]*Adler,* 144 F.3d at 670 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

[30]*Spaulding,* 279 F.3d at 904 (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986)).

[31]*Adams v. Am. Guar. & Liab. Ins. Co.,* 233 F.3d 1242, 1246 (10th Cir. 2000) (citing *Adler,* 144 F.3d at 671); *see also Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010).

[32]*Anderson,* 477 U.S. at 256; *Celotex,* 477 U.S. at 324; *Spaulding,* 279 F.3d at 904 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)).

[33]*Anderson,* 477 U.S. at 256; *accord Eck v. Parke, Davis & Co.,* 256 F.3d 1013, 1017 (10th Cir. 2001).

rational trier of fact could find for the nonmovant."[34]

Finally, summary judgment is not a "disfavored procedural shortcut"; on the contrary, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."[35] In responding to a motion for summary judgment, "a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial."[36] When examining the underlying facts of the case, the Court is cognizant that it may not make credibility determinations or weigh the evidence.[37]

## B. Discussion

Plaintiff's remaining claim in this case is based on medical negligence in obtaining plaintiff's informed consent for Dr. Amrani to perform her spinal surgery in November 2007. Defendant argues that summary judgment is appropriate on this claim because (1) plaintiff's claim fails as a matter of law without expert testimony, and (2) there is no genuine issue of material fact that Dr. Amrani's alleged failure to obtain informed consent caused plaintiff's injury. Because the first issue is moot in light of the Court's denial of the motion to exclude Dr. Graboff's testimony, the Court only needs to address the causation argument.

Under Kansas law, a plaintiff must show the following to prove causation in an informed consent case: "(1) an objectively reasonable patient would have declined treatment had the

---

[34]*Mitchell v. City of Moore, Okla.,* 218 F.3d 1190, 1197-98 (10th Cir. 2000) (quoting *Adler,* 144 F.3d at 671); *see Kannady*, 590 F.3d at 1169.

[35]*Celotex,* 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

[36]*Conaway v. Smith,* 853 F.2d 789, 794 (10th Cir. 1988).

[37]*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

14

patient been advised of a material risk or danger; (2) the patient was not advised of a material risk or danger; and (3) that risk or danger materialized, resulting in harm to the patient."[38] Defendant argues that plaintiff has failed to submit proof of the first causation requirement—that an objectively reasonable patient would have declined the treatment if properly advised of the risk. In fact, plaintiff testified during her deposition that she actively sought out Dr. Amrani to perform this surgery because Dr. Burton had refused given her age and the fact that she smoked. Plaintiff responds that she has presented evidence that creates a genuine issue of material fact on this issue. She submits her own affidavit, stating that she would have declined the surgery had she known and understood the risk of a non-union, and Dr. Graboff's testimony that, in his opinion, a reasonable patient who was provided the proper informed consent would have declined the surgery. The Court agrees that Dr. Graboff's deposition testimony is sufficient to create a genuine issue of material fact on this issue.[39]

Defendant contends that Dr. Graboff's deposition testimony is insufficient evidence of causation because he testified based on a hypothetical: that a person who was not provided with any information would not have agreed to the surgery. While defendant is correct that Dr. Graboff did testify about that hypothetical scenario, Dr. Graboff also testified in response to this question: "based on the information provided to you, [would] a reasonable patient . . . believe that a surgery like this had no possibility other than success"? Dr. Graboff responded, "I think if a reasonable patient had the proper information given to them in an informed consent, they

---

[38]*Rojas v. Barker*, 195 P.3d 785, 791 (Kan. Ct. App. 2008), *rev. denied*, (Kan. 2009).

[39]Plaintiff's affidavit and Dr. Burton's refusal to perform the spinal surgery go to the subjective element of causation, that she was not advised of the risk of non-union, they are not probative with regard to the objective element of causation.

would not. I don't believe that happened in this case."[40] This evidence is probative of the objective component of causation and is sufficient to create a genuine issue of material fact for the jury to decide. Accordingly, summary judgment is denied.

**IT IS THEREFORE ORDERED BY THE COURT** that defendant's Motion for Summary Judgment and motion to exclude the testimony of Dr. Graboff (Doc. 32) is **denied**.

**IT IS SO ORDERED.**

Dated: February 2, 2011

          S/ Julie A. Robinson
          JULIE A. ROBINSON
          UNITED STATES DISTRICT JUDGE

---

[40](Doc. 38, Ex. A at 101.)